**IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF TEXAS**

| | | |
|---|---|---|
| **COMMODITY FUTURES** | ) | |
| **TRADING COMMISSION,** | ) | **Case No. 4:18-cv-00260** |
| | ) | |
| | ) | |
| **Plaintiff,** | ) | **JURY DEMANDED** |
| | ) | |
| **v.** | ) | |
| | ) | |
| **KRISHNA MOHAN,** | ) | |
| | ) | |
| **Defendant.** | ) | |

**COMPLAINT FOR INJUNCTIVE RELIEF,
CIVIL MONETARY PENALTIES, AND OTHER RELIEF**

Plaintiff Commodity Futures Trading Commission ("CFTC") alleges as follows:

## I.     SUMMARY

1.     From at least November 25, 2013 to December 17, 2013 (the "Relevant Period"),

defendant Krishna Mohan ("Mohan") engaged in a manipulative and deceptive scheme while

placing orders for and trading futures contracts on at least two registered entities.  In furtherance

of the scheme, Mohan repeatedly engaged in manipulative or deceptive acts and practices by

"spoofing" (bidding or offering with the intent to cancel the bid or offer before execution).  On

tens of thousands of occasions during the Relevant Period, Mohan placed orders to buy or sell

futures contracts that he intended to cancel before execution at the time the orders were placed.

In doing so, Mohan intentionally or recklessly sent false signals of increased supply or demand

designed to trick market participants into executing against the orders he wanted filled.

2.     By virtue of this conduct, as further alleged herein, Mohan engaged in acts and

practices that violated Sections 4c(a)(5)(C) and 6(c)(1) of the Commodity Exchange Act ("Act"),

7 U.S.C. §§ 6c(a)(5)(C), 9(1) (2012), and CFTC Regulation ("Regulation") 180.1(a)(1) and (3),

17 C.F.R. § 180.1(a)(1), (3) (2017).

3.      The CFTC brings this action pursuant to Section 6c of the Act, 7 U.S.C. § 13a-1

(2012), to enjoin Mohan's violative acts and practices and to compel Mohan's compliance with

the Act and Regulation.  In addition, the CFTC seeks civil monetary penalties and such other

relief, including but not limited to disgorgement and trading and registration prohibitions, as this

Court deems necessary or appropriate.

## II.      JURISDICTION AND VENUE

4.      This Court has jurisdiction over this action under 28 U.S.C. § 1331 (2012)

(federal question jurisdiction) and 28 U.S.C. § 1345 (2012), which provides that district courts

have original jurisdiction over civil actions commenced by the United States or by any agency

expressly authorized to sue by Act of Congress.  Section 6c(a) of the Act,  7 U.S.C. § 13a-1(a)

(2012), authorizes the CFTC to seek injunctive relief in any proper district court of the United

States against any person whenever it shall appear to the CFTC that such person has engaged, is

engaging, or is about to engage in any act or practice constituting a violation of any provision of

the Act or any rule, regulation, or order thereunder.

5.      Venue properly lies with this Court pursuant to Section 6c(e) of the Act, because

Mohan transacted business in the Southern District of Texas, and acts and practices in violation

of the Act and Regulation occurred in this District.

## III.      PARTIES

6.      Plaintiff **Commodity Futures Trading Commission** is the independent federal

regulatory agency charged by Congress with the administration and enforcement of the Act and

Regulations promulgated thereunder. The CFTC is headquartered at 1155 21st Street, NW, Washington, DC 20581.

7. Defendant **Krishna Mohan** is an individual with a last known address in New York City, New York. From approximately August 2010 to March 26, 2014, Mohan was employed by a proprietary trading firm (the "Trading Firm") as a quantitative trader. Mohan has never been registered with the CFTC.

## IV.    OTHER RELEVANT PARTIES

8. The **Chicago Board of Trade** ("CBOT") is a commodity exchange located at 141 W. Jackson Boulevard, Chicago, Illinois 60604. CBOT is registered with the CFTC as a designated contract market.

9. The **Chicago Mercantile Exchange** ("CME") is a commodity exchange located at 20 S. Wacker Street, Chicago, Illinois 60606. CME is registered with the CFTC as a designated contract market and a swap execution facility.

10. **CME Group Inc.** ("CME Group") is a Delaware corporation with its principal place of business in Chicago, Illinois. CME Group is the holding company that owns and operates the CBOT and CME.

## V.    FACTS

### A. Futures Trading Background

11. A futures contract is an agreement to purchase or sell a financial instrument or physical commodity for delivery or cash settlement in the future at a specified price. A futures contract traded on an exchange has standard, non-negotiable contract specifications.

12. The E-mini Dow ($5) futures contract ("E-mini Dow contract") is traded on CBOT. There are four E-mini Dow contract months: March, June, September, and December.

The E-mini Dow contract is cash settled so no delivery of the stocks that make up the underlying index takes place.

13.     The value of the E-mini Dow contract is the Dow Jones Industrial Average Index multiplied by five dollars.  The price is quoted in index points, and the minimum price change, commonly called a "tick," that is allowed during a trading session is one index point.  For example, if a trader wished to place an order above the last-traded E-mini Dow contract price of 24802 points, that trader would have to place the order at 24803 points or higher.

14.     The E-mini NASDAQ 100 futures contract ("E-mini NASDAQ contract") is traded on CME.  There are four E-mini NASDAQ contract months:  March, June, September, and December.  The E-mini NASDAQ contract is cash settled so no delivery of the stocks that make up the underlying index takes place.

15.     The value of the E-mini NASDAQ contract is the NASDAQ 100 Index multiplied by twenty dollars.  The price is quoted in index points and the minimum price change, or tick, allowed during a trading session is one-quarter of an index point (.25).  For example, if a trader wished to place an order above the last-traded E-mini NASDAQ contract price of 6292.25 points, that trader would have to place the order at 6292.50 points or higher.

16.     Both the E-mini Dow contract and the E-mini NASDAQ contract trade nearly 24 hours per day from 5:00 PM Central Time on Sunday night to 4:00 PM Central Time on Friday afternoon, except for a 15-minute window each day when trading halts from 3:15 PM to 3:30 PM Central Time.  The trading day for the E-mini Dow contract and the E-mini NASDAQ contract generally consists of two trading sessions: the daytime session and the overnight session.  The daytime session runs from 8:30 AM to 3:15 PM Central Time and the overnight session begins after the 15-minute trading halt and runs from 3:30 PM to 8:29:59 AM Central Time the next

day.  The daytime session corresponds with, but does not perfectly overlap, the trading day for the stocks that make up the underlying indices, which runs from 8:30 AM to 3:00 PM Central Time on the NYSE and NASDAQ exchanges.

17.     An "order," in the context of electronic exchange trading, is a request submitted to an exchange to buy ("bid") or sell ("offer" or "ask") a certain number of a specified futures contract.  An order is for one or more contracts.  Contracts may also be called "lots," among other things.  Orders are entered into the exchange's order book.  Contracts available for execution in the order book are sometimes referred to as "working lots."  When there exists both a willing buyer and seller for a contract at a given price, a transaction occurs and is referred to as a "fill" (or a "trade" or "execution").  At any time before the order is fully filled, the trader can "cancel" the order.  When an order is canceled, the contracts that have not yet been bought or sold are pulled from the order book.

18.     Each trader can view the aggregate number of contracts and number of orders that all traders are actively bidding or offering at a given price level.  Only the total numbers of orders and contracts at various price levels are visible, not the number of traders or identities of the traders who placed the orders.  The best-bid level, or first-bid level, is the highest price at which someone is willing to buy.  The best-ask level, or first-ask level, is the lowest price at which someone is willing to sell.  The bid-ask spread is the difference between these two prices.

19.     Traders can view the aggregate resting contracts and orders up to the tenth-bid and tenth-ask levels.  This combined bid and ask information is often referred to as the visible order book and represents the visible market depth.  Traders often consider information in the order book when making trading decisions.

20.     An "iceberg order," also known as a hidden quantity order, is an order type offered by certain designated contract markets on electronic trading platforms whose order quantity (i.e., number of contracts) is only partially visible in the order book to other market participants.  For example, if a trader places an iceberg order to buy forty contracts, he or she may choose to display only one contract (or any other quantity up to the total quantity of the iceberg order may be selected by the trader) in the order book, thereby hiding the remaining thirty-nine contracts from view in the order book.

21.     An "aggressive order" is an order that crosses the bid-ask spread.  On the buy side of the market, an aggressive buy order is placed at the best-ask price or higher so, put simply, it is an offer to buy at a price that another trader is currently willing to sell.  On the sell side of the market, an aggressive sell order is placed at the best-bid price or lower so, put simply, it is an offer to sell at a price that another trader is currently willing to buy.  Accordingly, aggressive orders are guaranteed to execute, at least partially, immediately after being placed.

22.     A "passive order," on the other hand, does not give up the spread in price.  On the buy side of the market, a passive buy order is placed at the best-bid price or lower; so, put simply, it is an offer to buy at a price that is lower than the price that other traders are currently willing to sell.  On the sell side of the market, a passive sell order is placed at the best-ask price or higher; so, put simply, it is an offer to sell at a price that is higher than the price that other traders are currently willing to buy.  Passive orders rest for at least some amount of time after being placed and are not guaranteed to execute.

23.     The E-mini Dow contract and E-mini NASDAQ contract are traded electronically on the CME Globex trading system ("Globex").  Globex employs a matching algorithm to match bids and offers for execution.  The matching algorithm for the E-mini Dow contract and E-mini

NASDAQ contract is known as "FIFO," which denotes first-in, first-out.  Under the FIFO method, orders on the same side of the market (i.e., the buy side or the sell side) and at the same price are filled based on time priority.  For example, if two buy orders are placed passively at the same bid price of 6292.50, and then an aggressive offer to sell one contract at 6292.50 enters to market, the buy order that was placed first will have one contract fill against the sell order.  Thus, as a general rule, the order that was placed first trades first, irrespective of the order's size.  An exception to this rule applies to iceberg orders—with iceberg orders, once the visible quantity is completely filled, the replenishment quantity goes to the back of the time priority queue.

**B.  Mohan's Manipulative and Deceptive Scheme**

24.    Mohan began working at the Trading Firm as a quantitative trader in approximately August 2010.  In this role, he traded futures contracts on behalf of the Trading Firm on U.S. exchanges during the Relevant Period, including with one or more counterparties residing in the Southern District of Texas.

25.    Prior to 2013, Mohan provided technical trading support to a team of traders at the Trading Firm and worked on the development of algorithmic trading programs and semi-automatic trading tools.  In mid-2013, Mohan began learning to trade futures contracts manually.  By early November 2013, Mohan was fully engaged in manually trading futures contracts on behalf of the Trading Firm.  Mohan connected to Globex through the Trading Firm's trade servers, which implemented the Trading Firm's trading control infrastructure called "Generic Trading Infrastructure."  During the Relevant Period, at least three Globex Operator IDs (Tag 50s IDs) were registered to Mohan and used by him to place trades at CBOT and CME.  In addition, during the Relevant Period, Mohan used the login ID "kmohan" to first access the

Trading Firm's proprietary system, "SuperGUI," and then process orders through a trade server to Globex.

26.     SuperGUI provided the Trading Firm's manual traders various tools designed to significantly decrease the amount of time (and computer mouse clicks) required to execute trading strategies.  These tools included, among other things, the ability to:  modify personal default settings (to, for example, set automatic display quantities for iceberg orders); pre-set left and right computer mouse buttons to defined contract order sizes; input orders by clicking price levels on a trading ladder screen; utilize features such as an order splitter, which placed multiple randomly-sized orders at once; or automate repetitive tasks via pre-programmed hotkeys.

27.     During the Relevant Period, Mohan engaged in a manipulative and deceptive scheme, in which he repeatedly spoofed the E-mini Dow contract and the E-mini NASDAQ contract markets while placing orders for, and trading futures contracts through, accounts owned by the Trading Firm (the "Scheme").  As part of this Scheme, Mohan repeatedly utilized December 2013 and March 2014 E-mini NASDAQ contracts and December 2013 and March 2014 E-mini Dow contracts.

28.     Mohan's Scheme consisted of the following observed pattern:  (1) on one side of the market, placement of at least one passive iceberg order, showing a small visible quantity to the market, ("Genuine Order(s)"); (2) on the opposite side of the Genuine Order, placement of one or more fully-visible passive order(s)—often several randomly-sized orders placed using the order splitter tool—with the intent to cancel before execution ("Spoof Order(s)"); (3) the Genuine Order(s) and the Spoof Order(s) are available for execution at the same time; (4) at the time he placed one or more of the Spoof Orders, Mohan's total number of visible working lots placed on the Spoof Order side of the market is at least nine times greater than Mohan's total

number of visible working lots on the Genuine Order side of the market; and (5) at the placement of at least one of the Spoof Order(s), Mohan's number of working lots placed on the opposite side of the Genuine Order increases by at least forty contracts compared to the number of working lots present on the opposite side of the Genuine Order at the placement of the Genuine Order.

29.    Instances of this pattern that last no longer than sixty seconds (as measured from placement of the first Genuine Order to the cancellation or complete execution of the last Genuine Order) are classified as "Events."  The pattern is often repeated sequentially on one side of the market (e.g., with a Genuine Order(s) to buy at or below the current bid) and then on the other side (e.g., with a Genuine Order(s) to sell at or above the current ask), and the Genuine Orders may overlap in time.  Instances where the Genuine Orders on opposite sides overlap in time are grouped together as a single "Event."  Collectively, "Genuine Order(s)" and "Spoof Order(s)" are referred to as "Event Orders."

30.    Mohan's Scheme was designed to benefit financially from market participants' reactions to his Spoof Orders.  The following is a simplified explanation of how his Scheme was intended to work, using a hypothetical example of a Spoof Order on the buy side.  A large Spoof Order to buy would result in an increase in demand in the order book (e.g., create or add to an order book imbalance in which orders to buy outweigh orders to sell).  This increase would be visible to other market participants and may lead them to conclude that the price is likely to rise. This conclusion, in turn, would impact market participants' decisions, including prompting some to attempt to purchase contracts before the predicted rise in price happens.  In such a case, these participants would place aggressive orders to buy (i.e., at a higher price than the currently resting bids in the market), making execution of orders resting on the opposite side of the Spoof Order

more likely.  Finally, these bids would enable orders on the opposite side of the Spoof Order—such as Mohan's Genuine Orders—to fill sooner, at a better price, or in larger quantities than they otherwise would.

31.     During the Relevant Period, as part of the ongoing Scheme, Mohan engaged in approximately 1,500 Events.  As part of those Events, Mohan entered about 2,400 Genuine Orders and 36,300 Spoof Orders, with most of the Spoof Orders, according to the pattern alleged herein, quickly being cancelled.

32.     Mohan intended to cancel the Spoof Orders before execution, and often did so after his Genuine Orders were filled.  The predictable sequence inherent in Mohan's spoofing pattern demonstrates that Mohan was not reacting to market changes when he canceled the Spoof Orders; rather, he was carrying out a predetermined strategy that was not dependent on market conditions.

33.     By engaging in the Scheme as described herein, Mohan entered Spoof Orders intending either to intentionally send a false signal to the market that he actually wanted to buy or sell the number of contracts specified in the Spoof Orders, or while recklessly disregarding the fact that entering his Spoof Orders would send such a false signal—a signal that injected false information about supply and demand into the market that could affect market activity.  Mohan engaged in this Scheme to trick other market participants into executing against his Genuine Orders on the opposite side of the market—to fill sooner, at a better price, or in larger quantities than they otherwise would.  Mohan knew or recklessly disregarded that the Spoof Orders would create the false appearance of market depth and result in misinformation, thereby luring market participants to trade based on Mohan's spoofing.  The risk that the Spoof Orders could mislead other market participants into believing there was genuine interest in purchasing or selling the

specified number of contracts represented by Mohan's Spoof Orders was so obvious that Mohan must have been aware of it.  He knew that his Spoof Orders would appear in the order book and that traders often consider order-book information in making trading decisions; thus, Mohan was, at least, reckless with respect to the danger that his Spoof Orders would mislead other market participants.

34.     Mohan frequently canceled his Spoof Orders, only to quickly replace them with Genuine Orders on the same side of the market as the cancelled Spoof Orders.  Mohan placed more than 450 Genuine Orders within one second or less of the cancelation of a Spoof Order(s) and on the same side of the market as the canceled Spoof Order(s).  Moreover, approximately 80% of these Genuine Orders were placed at the exact same price as the Spoof Order that was cancelled just one second or less before, which further demonstrates Mohan's intent to trade only Genuine Orders.

35.     In some instances, after using his Scheme to establish a position, Mohan then used his Scheme on the other side of the market to offset the position he just established.  For example, Mohan would cancel his Spoof Orders (that were fully visible), only to quickly replace them with Genuine Orders (placed as icebergs) followed by Spoof Orders (that were fully visible) opposite the newly-placed Genuine Order (and thus opposite the Spoof Orders that he had just canceled).

36.     Although Mohan's Spoof Orders were visible to the rest of the market, his identity as the originator of those orders was not.  Only the total number of orders and contracts at various price levels are visible, not the number of traders or identities of the traders who placed the orders.  Accordingly, Mohan knew that other market participants could not see that

the same trader had placed both the Spoof Orders and the Genuine Orders, which might have tipped off market participants that his Spoof Orders were not bona fide.

37.     Mohan concealed the size of his Genuine Orders from the rest of the market by placing them as iceberg orders.  This allowed Mohan to reveal only a small portion of his true interest to the market—typically only one contract—while at the same time showing significant interest on the spoof side of the market.  Mohan utilized the iceberg order feature with his Genuine Orders in order to conceal the increased supply or demand associated with his Genuine Orders from the market.  Mohan did this because the Scheme's success depended on other traders believing there was increased supply or demand on the spoof side of the market, not the genuine side.

38.     To further disguise his activity to the market, Mohan routinely made use of an order splitter tool in SuperGUI to place multiple Spoof Orders at once.  Mohan used the order splitter to place approximately 99.3% of the Spoof Orders he placed in the E-mini Dow contract market and approximately 99.8% of the Spoof Orders he placed in the E-mini NASDAQ contract market.  Mohan utilized the order splitter in order to engineer the appearance that his order placement activity was actually originating from multiple sources and in randomized amounts (signaling increased supply or demand from multiple sources), when in fact all of the additional increase in supply or demand associated with the Spoof Orders placed via the order splitter originated with Mohan.

39.     Trading overnight was a key component of Mohan's Scheme and indicative of his wrongful intent.  Mohan carried out his Scheme nearly 95% of the time during overnight sessions, when trading volume and volatility were substantially decreased.  As a result, Mohan was able to use smaller spoofing orders (with concomitant lower financial risk) to provoke the

market reactions he desired.  Moreover, because of the reduced volume and volatility in the overnight sessions, Mohan's Spoof Orders were more likely to have their desired impact—to make an execution of the Genuine Order more likely.

40.     Mohan's efforts to avoid execution of his Spoof Orders were successful.  This is reflected in the vastly diverging fill ratios corresponding with Mohan's Genuine Orders and Spoof Orders.  Mohan placed approximately 2,400 Genuine Orders during the Relevant Period.  Of those, about 39% of the contracts associated with the Genuine Orders were filled.  By contrast, less than 1% of the contracts associated with the approximately 36,300 Spoof Orders were filled.

41.     The stark contrast in fill ratios of his Spoof Orders and Genuine Orders is even more indicative of his illegal intent when put in context of the differing order types he used to place Spoof and Genuine Orders.  As a baseline, whether an order (such as Mohan's Spoof Orders) is filled is not dependent on its size; rather, orders at the same price level execute according to time priority under the FIFO matching algorithm.  Iceberg orders (such as Mohan's Genuine Orders), on the other hand, execute incrementally by their visible quantity under the FIFO matching algorithm; meaning, after the visible quantity is executed, a new portion of the iceberg becomes visible to the market and that visible amount goes to the end of the queue.  Consequently, the Genuine Orders, placed as icebergs, were less likely to fully execute (as compared to a non-iceberg order placed at the same time) given their treatment under the FIFO matching algorithm, which sent newly visible portions of the iceberg to the back of the queue following an execution on a previously visible portion.  The Spoof Orders, on the other hand, were not subject to such a limitation under the matching algorithm.  Yet, despite this additional

limitation, the fill ratios show that the Genuine Orders executed frequently, whereas the Spoof Orders did not.

42.      During the Relevant Period, Mohan tended to cancel his Spoof Orders quickly after getting filled on a Genuine Order.  Mohan canceled approximately 60% of Spoof Orders placed at the first level of the order book within one second or less of the last fill of the Genuine Order.  He cancelled approximately 84% of Spoof Orders placed at the first level of the order book within two seconds or less of the last fill of his Genuine Order.  Indeed, the closer Mohan's Spoof Orders were to the top of the order book (and thus the more likely to be at risk of being filled), the quicker he cancelled those Spoof Orders following the last fill on the Genuine Order.

43.      Mohan placed his Spoof Orders in a manner to avoid being filled by placing them behind existing orders, typically at the first or second level of the order book, and by limiting their duration.  During the Relevant Period, the median duration of Mohan's Spoof Orders in E-mini Dow contracts was 1.7 seconds, compared with 7.5 seconds for his Genuine Orders and 8.3 seconds for his non-Event Orders.  Similarly, the median duration of Mohan's Spoof Orders in E-mini NASDAQ contracts was 1.9 seconds, compared with 7.7 seconds for his Genuine Orders and 4.6 seconds for his non-Event Orders.  This disparity in duration between Mohan's Spoof Orders and non-spoof orders further indicates his intent to cancel the Spoof Orders before execution.

44.      Mohan's Spoof Orders comprised a substantial portion of the total working lots in the E-mini Dow and E-mini NASDAQ market order books during the Relevant Period.  For example, half of Mohan's Spoof Orders at the best-bid/offer level in the E-mini Dow market comprised at least 87% of the contracts available at that level and half of Mohan's Spoof Orders at the best-bid/offer level in the E-mini NASDAQ markets comprised at least 85% of the

contracts available at that level.  Despite representing such a significant portion of the E-mini

Dow and E-mini NASDAQ market order books, Mohan's Spoof Orders rarely executed—further

demonstrating that Mohan did not intend for his Spoof Orders to trade.

45.    Mohan's Scheme frequently worked as planned; that is, his Spoof Orders tricked

other market participants into executing against his Genuine Orders.  However, there were times

that Mohan's Genuine Orders continued to sit, unfilled, even after he placed and canceled his

Spoof Orders; thus, not all of the Events resulted in executions of Mohan's Genuine Orders.  *See*

*infra* Section C., iv., ¶ 55.  Still, the fill ratio associated with Mohan's Genuine Orders was

approximately thirty-nine times higher than that associated with his Spoof Orders, again

demonstrating the differing intent behind his Spoof Orders and Genuine Orders.

46.    Mohan's Google Drive folder contained documents describing certain spoofing

strategies.  For example, one such document references a "Smart Stuffing book.(order cancel

replace)," which would:

> allow trader to control which side they want to show bluff. trader decide each
> level how many contracts should be put in. and contracts should be break into
> multiple smaller contracts in random size which overall average order size match
> with the entire books average size. we can also add 30,40,50 contracts into the
> book to mimic market makers. never throw easily detected size like 100/200/250
> or 60s like 9ner.
>
> Only put bluffing orders in when book exceed 400 contract. and flipped for more than
> 500 ms.
>
> every 10 second add 1 lot in the existing order and minus 1 lot to make sure every order
> of ours will be at the back of the queue. make a butt called (refresh bluffing)
>
> All those orders are not mean to be traded. if for any reason some one flush big size and
> bluff order get filled, order will be sent out immediately to the price it get filled try to
> scratch out.

C. **Examples of Mohan's Scheme**

47.     Mohan's Scheme is illustrated in the four Events set forth below.  Detailed trade

data associated with these Events is provided in Exhibits A-D to this Complaint.

### *i.   November 27, 2013—December 2013 E-Mini Dow Contract*

48.     Mohan's trading in the morning of November 27, 2013, constitutes an Event

pursuant to his Scheme.  *See* Ex. A (displaying detailed trade data).  At 8:05:39.461 AM Central

Time (denoted in hours, minutes, seconds, and milliseconds), Mohan placed an iceberg order to

buy forty E-mini Dow contracts (displaying only one contract to the market) at the second-bid

level (first Genuine Order).  At 8:05:40.703 AM, Mohan placed multiple orders, via an order

splitter, to collectively sell forty E-mini Dow contracts at the second-ask level (first group of

Spoof Orders).  The first group of Spoof Orders caused the total number of contracts then resting

at the second-ask level to more than quadruple.  Only 630 milliseconds after entering his first

group of Spoof Orders, at 8:05:41.333 AM, Mohan's first Genuine Order began to trade.  Within

two milliseconds, or by 8:05:41.335 AM, all forty contracts of the first Genuine Order were

filled.  Having completely filled the first Genuine Order, Mohan then proceeded to cancel the

first group of Spoof Orders at 8:05:42.684 AM, just over one second after the first Genuine

Order was fully filled and less than two seconds after he placed his first group of Spoof Orders.

49.     Less than a second later, Mohan immediately repeated his spoofing pattern on the

other side of the market.  At 8:05:43.565 AM, Mohan placed an iceberg order to sell forty E-mini

Dow contracts (again displaying only one contract to the market) at the best-ask level (second

Genuine Order).  Approximately one and one-half seconds later, at 8:05:45.024 AM, Mohan

placed multiple orders, via an order splitter, to collectively buy forty E-mini Dow contracts at the

second-bid level (second group of Spoof Orders).  The second group of Spoof Orders nearly

tripled the number of contracts then resting at that level of the order book.  At 8:05:45.117 AM, only ninety-three milliseconds after he placed the second group of Spoof Orders, Mohan's second Genuine Order began to trade, with fourteen of the forty contracts filling by 8:05:46.239 AM.  At 8:05:46.239 AM, Mohan placed another group of orders, via an order splitter, to collectively buy forty E-mini Dow contracts at the best-bid level (third group of Spoof Orders).  The third group of Spoof Orders caused the total number of contracts at that level of the order book to more than quadruple.  One millisecond after placing the third group of Spoof Orders, at 8:05:46.240 AM, the second Genuine Order resumed trading and its twenty-six remaining contracts instantly filled by 8:05:46.241 AM.  Having completely filled the second Genuine Order, Mohan then proceeded to cancel the third group of Spoof Orders at 8:05:47.085 AM and the second group of Spoof Orders at 8:05:47.421 AM.  Mohan's cancellation of the third group of Spoof Orders came less than one second after the second Genuine Order was fully filled and less than one second after he placed the third group of Spoof orders.  Mohan's cancellation of the second group of Spoof Orders came less than one and one-half seconds after the second Genuine Order was fully filled and less than two and one-half seconds after he placed the second group of Spoof orders.

### ii.  *December 2, 2013—December 2013 E-mini NASDAQ Contract*

50.    Mohan executed his Scheme in the early morning of December 2, 2013, in the E-mini NASDAQ contract.  *See* Ex. B.  At 3:01:50.862 AM Central Time, Mohan placed an iceberg order to buy forty E-mini NASDAQ contracts (with only one contract visible to the market) at the best-bid level (first Genuine Order).  Approximately ten seconds later, at the second-ask level, Mohan placed two groups of orders, both groups via an order splitter, to collectively sell eighty E-mini NASDAQ contracts at 3:02:00.909 AM (first group of Spoof

Orders) and 3:02:01.327 AM (second group of Spoof Orders).  Together, the two groups of Spoof Orders caused the total number of contracts then resting at that level of the order book to more than quadruple.  At 3:02:02.279 AM, approximately one second after he placed the second group of Spoof Orders, the first Genuine Order began to trade and completely filled within four milliseconds by 3:02:02.283 AM.  Having completely filled the first Genuine Order, Mohan then proceeded to cancel both the first group of Spoof Orders and the second group of Spoof Orders at 3:02:02.735 AM through 3:02:02.736 AM, less than a half-second after the first Genuine Order was fully filled.  Mohan cancelled the first group of Spoof Orders and the second group of Spoof Orders less than two seconds after he placed both groups of orders.

51.    Almost two seconds later, Mohan repeated his spoofing pattern on the other side of the market.  At 3:02:04.670 AM, Mohan placed an iceberg order to sell 40 E-mini NASDAQ contracts (with one contract showing to the market) at the best-ask level (second Genuine Order). Approximately six seconds later, at 3:02:11.103 AM, Mohan placed multiple orders, via an order splitter, to collectively buy forty E-mini NASDAQ contracts at the best-bid level (third group of Spoof Orders).  The third group of Spoof Orders caused the total number of contracts then resting at that level of the order book to more than triple.  The second Genuine Order immediately began to trade at 3:02:11.104 AM, filling in full five milliseconds later at 3:02:11.109 AM.  Having completely filled the second Genuine Order, Mohan then proceeded to cancel the third group of Spoof Orders between 3:02:11.878 AM and 3:02:11.879 AM—less than one second after the second Genuine Order fully filled and less than one second after he placed the third group of Spoof Orders.

### iii.   December 9, 2013–December 2013 E-mini NASDAQ Contract

52.     A third example containing Genuine Orders on both sides of the market occurred in the overnight session of December 9, 2013.  *See* Ex. C.  At 5:27:41.553 AM Central Time, Mohan placed an iceberg order to buy forty E-mini NASDAQ contracts (showing only one contract to the market) at the best-bid level (first Genuine Order).  Just over one second later, at 5:27:42.713 AM, Mohan placed multiple orders, via an order splitter, to collectively sell forty E-mini NASDAQ contracts at the second-ask level (first group of Spoof Orders).  The first group of Spoof Orders caused the total number of contracts then resting at that level of the order book to increase five-fold.  At 5:27:43.225 AM, approximately a half-second after placing the first group of Spoof Orders, Mohan placed another group of orders, via an order splitter, to collectively sell forty E-mini NASDAQ contracts at the best-ask level (the second group of Spoof Orders).  The second group of Spoof Orders caused the total number of futures contracts then resting at that level of the order book to increase by over seven-fold.  At 5:27:43.228 AM, just three milliseconds after placing the second group of Spoof Orders, Mohan's first Genuine Order began to trade and seventeen of the forty contracts filled within 284 milliseconds.  At 5:27:44.208 AM, Mohan canceled the second group of Spoof Orders less than one second after the first Genuine Order was partially filled and less than one second after he placed the second group of Spoof Orders.  Mohan then cancelled the first group of Spoof Orders (which was higher in the order book and at less risk of execution) just over a second later, at 5:27:45.480 AM.  The cancellation of the first group of Spoof Orders occurred just under two seconds after the last fill of the first Genuine Order and less than three seconds after he placed the first group of Spoof Orders.

53.     At 5:27:44.772 AM, just over one second after trading into a long position of seventeen contracts in the E-mini NASDAQ contract (i.e., the seventeen contract buy side fill that began at 5:27:43.228 AM referenced above in ¶ 52), Mohan placed an iceberg order to sell seventeen E-mini NASDAQ contracts (with one contract showing to the market) at the best-ask level (second Genuine Order).  At 5:27:46.505 AM, Mohan placed multiple orders, via an order splitter, to collectively buy forty E-mini NASDAQ contracts at the second-bid level (third group of Spoof Orders).  The third group of Spoof Orders caused the total number of contracts then resting at the second-bid level to more than quadruple.  Only 328 milliseconds later, at 5:27:46.833 AM, Mohan placed another group of orders, via an order splitter, to collectively buy forty E-mini NASDAQ contracts at the best-bid level (fourth group of Spoof Orders).  The fourth group of Spoof Orders caused the total number of contracts then resting at that level of the order book to more than quadruple.  The second Genuine Order began to trade at 5:27:46.834 AM, filling in full one millisecond later at 5:27:46.835 AM.  At 5:27:47.568 AM, Mohan canceled both his first Genuine Order (with twenty-three contracts remaining unsold) and his fourth group of Spoof Orders, less than one second after the second Genuine Order was fully filled and less than one second after he placed the fourth group of Spoof Orders.  He canceled his third group of Spoof Orders at 5:27:47.976 AM, just over one second after the second Genuine Order was fully filled and just under one and one-half seconds after he placed the third group of Spoof Orders.

54.     As part of a CME investigation regarding Mohan's spoofing, CME staff questioned Mohan about this particular Event during a recorded interview.  Mohan refused to answer any questions related to this Event, including specific questions about whether he intended to cancel the orders described above before execution.  Mohan similarly refused to answer questions regarding other examples of order placement activity that CME staff showed to

him during the interview.  Mohan also refused to answer questions on related subjects, such as his order splitter usage, the purpose of his iceberg order usage, and the cancellation rates associated with his order placement activity.

### iv.   December 3, 2013–December 2013 E-mini NASDAQ Contract

55.     Mohan's trading in the early morning hours of December 3, 2013, shows an Event that did not result in execution of the Genuine Order, contrary to Mohan's plan.  *See* Ex. D.  At 2:34:47.807 AM Central Time, Mohan placed an iceberg order to buy forty E-mini NASDAQ contracts (showing only one to the market) at the best-bid level (Genuine Order).  Approximately one second later, at 2:34:48.887 AM, he placed multiple orders, via an order splitter, to collectively sell forty E-mini NASDAQ contracts at the best-ask level (first group of Spoof Orders) and quickly canceled the first group of Spoof Orders 712 milliseconds later.  Between 2:34:50.767 AM and 2:34:50.768, Mohan then placed another group of orders, via an order splitter, to collectively sell forty E-mini NASDAQ contracts at the second-ask level (second group of Spoof Orders), followed 455 milliseconds later, at 2:34:51.223 AM, by yet another group of orders, via an order splitter, to collectively sell forty E-mini NASDAQ contracts at the best-ask level (third group of Spoof Orders).  At 2:34:51.847 AM, Mohan canceled his third group of Spoof Orders only 624 milliseconds after placing them; and, at 2:34:52.407 AM, he canceled his second group of Spoof Orders less than two seconds after placing them.  Mohan let his Genuine Order rest slightly longer, but canceled it in full at 2:34:53.062 AM, just over five seconds after he placed it.

## VI.   VIOLATIONS OF THE COMMODITY EXCHANGE ACT

### COUNT I

### VIOLATIONS OF SECTION 4c(a)(5)(C) OF THE ACT, 7 U.S.C. § 6c(a)(5)(C)

#### Spoofing

56.     Paragraphs 1 through 55 are re-alleged and incorporated herein by reference.

57.     By reason of the conduct described above, Mohan engaged in trading, practices, or conduct on or subject to the rules of a registered entity that is, is of the character of, or is commonly known to the trade as, "spoofing" (bidding or offering with the intent to cancel the bid or offer before execution).

58.     In placing each Spoof Order, Mohan acted with the intent to cancel the bid or offer before execution.

59.     By reason of the foregoing, Mohan violated Section 4c(a)(5)(C) of the Act, 7 U.S.C. § 6c(a)(5)(C) (2012).

60.     Each Spoof Order constitutes a separate and distinct violation of Section 4c(a)(5)(C) of the Act.

### COUNT II

### VIOLATIONS OF SECTION 6(c)(1) OF THE ACT, 7 U.S.C. § 9(1), AND REGULATION 180.1(a)(1) AND (3), 17 C.F.R. § 180.1(a)(1), (3)

#### Use of Manipulative Device, Scheme, or Artifice

61.     The allegations set forth in paragraphs 1 through 55 are re-alleged and incorporated herein by reference.

62.     By reason of the conduct described above, Mohan, in connection with a contract for future delivery on a registered entity, intentionally or recklessly:  (1) used or employed, or attempted to use or employ, manipulative devices, schemes, or artifices to defraud; or

(2) engaged, or attempted to engage, in acts, practices, or courses of business, which operated or would have operated as a fraud or deceit upon market participants.

63.     Mohan acted intentionally or recklessly.

64.     By reason of the foregoing, Mohan violated Section 6(c)(1) of the Act, 7 U.S.C. § 9(1) (2012), and Regulation 180.1(a)(1) and (3), 17 C.F.R. § 180.1(a)(1), (3) (2017).

65.     Each Spoof Order, Event, and Scheme constitutes a separate and distinct violation of Section 6(c)(1) of the Act and Regulation 180.1(a)(1) and (3).

## VII.    RELIEF REQUESTED

WHEREFORE, the CFTC respectfully requests that the Court, as authorized by Section 6c of the Act, 7 U.S.C. §13a-1 (2012), and pursuant to its own equitable powers:

A.     Enter an order finding that Mohan violated Sections 4c(a)(5)(C) and 6(c)(1) of the Act, 7 U.S.C. §§ 6c(a)(5)(C), 9(1) (2012), and Regulation 180.1(a)(1) and (3), 17 C.F.R. § 180.1(a)(1), (3) (2017);

B.     Enter an order of permanent injunction enjoining Mohan and his affiliates, agents, servants, employees, successors, assigns, attorneys, and all persons in active concert with him who receive actual notice of such order by personal service or otherwise, from violating Sections 4c(a)(5)(C) and 6(c)(1) of the Act and Regulation 180.1(a)(1) and (3);

C.     Enter an order of permanent injunction enjoining Mohan and his affiliates, agents, servants, employees, successors, assigns, attorneys, and all persons in active concert with him, from directly or indirectly:

1.     Trading on or subject to the rules of any registered entity (as that term is defined in Section 1a(40) of the Act, 7 U.S.C. § 1a(40) (2012));

2.     Entering into any transactions involving "commodity interests" (as that term is defined in Regulation 1.3(yy), 17 C.F.R. § 1.3(yy) (2017)) for his

own personal account or for any account in which he has a direct or indirect interest;

3. Having any commodity interests traded on his behalf;

4. Controlling or directing the trading for or on behalf of any person or entity, whether by power of attorney or otherwise, in any account involving commodity interests;

5. Soliciting, receiving, or accepting any funds from any person for the purpose of purchasing or selling any commodity interests;

6. Applying for registration or claiming exemption from registration with the CFTC in any capacity, and engaging in any activity requiring such registration or exemption from registration with the CFTC, except as provided for in Regulation 4.14(a)(9), 17 C.F.R. § 4.14(a)(9) (2017); and/or

7. Acting as a principal (as that term is defined in Regulation 3.1(a), 17 C.F.R. § 3.1(a) (2017)), agent or any other officer or employee of any person (as that term is defined in Section 1a(38) of the Act, 7 U.S.C. § 1a(38) (2012)), registered, exempted from registration or required to be registered with the CFTC except as provided for in Regulation 4.14(a)(9), 17 C.F.R. § 4.14(a)(9) (2017).

D. Enter an order directing Mohan to be assessed by the Court, in an amount not to exceed the penalty prescribed by Section 6c(d)(1) of the Act, 7 U.S.C. § 13a-1(d)(1) (2012), as adjusted for inflation pursuant to the Federal Civil Penalties Inflation Adjustment Act Improvements Act of 2015, Pub. L. 114-74, 129 Stat. 584 (2015), title VII, Section 701, *see* Regulation 143.8, 17 C.F.R. § 143.8 (2017), for each violation of the Act, as described herein;

E. Enter an order requiring Mohan to pay costs and fees, as permitted by 28 U.S.C. §§ 1920 and 2412(a)(2) (2012); and

F. Enter an order providing for such other and further remedial and ancillary relief, including, but not limited to, disgorgement, as the Court may deem necessary and appropriate.

Dated:  January 28, 2018                  Respectfully submitted,

PLAINTIFF COMMODITY FUTURES
TRADING COMMISSION


*s/ Peter L. Riggs*
Peter L. Riggs (*pro hac vice* pending), Attorney in
Charge (Missouri Bar #57268)
Rachel A. Hayes (*pro hac vice* pending) (Missouri
Bar #48713)
Rebecca S. Jelinek (*pro hac vice* pending) (Missouri
Bar #53586)
Commodity Futures Trading Commission
4900 Main Street, Ste. 500
Kansas City, Missouri 64112
Telephone:  (816) 960-7700
Facsimile:  (816) 960-7751
priggs@cftc.gov
rhayes@cftc.gov
rjelinek@cftc.gov

Attorneys for Plaintiff